Attachment B

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| RANBAXY LABORATORIES LIMITED, RANBAXY INC., and RANBAXY PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MICHAEL O. LEAVITT SECRETARY OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES, ANDREW C. VON ESCHENBACH, ACTING COMMISSIONER OF FOOD AND DRUGS, and FOOD AND DRUG ADMINISTRATION, | ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 05-CV-01838 (RWR) |
| Defendants. | ) ) | |

---

## DECLARATION OF MICHAEL R. WARD, PH.D.

I, MICHAEL R. WARD, declare as follows:

1. I am an Associate Professor of Economics at the University of Texas at Arlington. I have earned a Baccalaureate degree from UCLA in Mathematics and Economics and Masters and Doctorate degrees from the University of Chicago in Economics. From 1991 to 1995, I was employed as a staff economist at the Federal Trade Commission examining issues related to competition and competition policy. I joined the faculty of the University of Illinois at Urbana-Champaign in 1995 as an Assistant Professor of Consumer Economics and was promoted to

1

Associate Professor in 2001. Since visiting the University of Texas at Arlington for the 2002-2003 academic year, I have accepted an Associate Professor of Economics position at that institution.

2. My professional experience with the pharmaceutical industry began with my Ph.D. dissertation studying Research & Development (R&D) incentives in the pharmaceutical industry. At the Federal Trade Commission, my particular expertise was related to empirical estimation of competition issues and competition in high technology industries including the pharmaceutical industry. This expertise was used in some pharmaceutical investigations. While there, I wrote a couple of articles related to FDA drug approval policy and, with David Reiffen, began a study of the evolution of generic industry competition that eventually became an FTC working paper.[1] A version of this study has been published in a peer-reviewed economics journal[2] as will be a subsequent article written with David Reiffen concerning innovator strategy as it relates to generic drug entry.[3] My curriculum vitae is attached to this report as Exhibit A.

3. I have been asked by counsel for Ranbaxy to explain the economics surrounding generic drug entry decisions, especially the incentive effects of certain possible regulatory decisions. In particular, I have been asked to explain the likely effects of 180-day exclusivity [associated with so called paragraph IV entry to generic drug introductions that do not face patent litigation]. I have also been asked to explain the possible strategic incentives for innovator drug companies to "delist" patents from the Orange book.

---

1. Reiffen, D and M. Ward (2002) "Generic Drug Industry Dynamics" Federal Trade Commission Working Paper # 248 <http://www.ftc.gov/be/workpapers/industrydynamicsreiffenwp.pdf>.

2. David Reiffen and Michael R. Ward, "Generic Drug Industry Dynamics," *Review of Economics and Statistics*, 87(1) (Feb. 2005) 37-49.

3. David Reiffen and Michael R. Ward, "'Branded Generics' as a Strategy to Limit Cannibalization of Pharmaceutical Markets," *Managerial and Decision Economics*, forthcoming.

2

4. Specifically, I explain:

   a) How 180-day exclusivity provides an incentive to entry by generic drug companies.

   b) How denying 180-day exclusivity to generic drug companies who avoid patent litigation while allowing 180-day exclusivity to generic drug companies who face patent litigation may reduce the number and speed of generic drug entry to the detriment of consumers.

   c) How denying exclusivity would have the perverse incentive of punishing firms that take steps to avoid patent litigation where generic drug companies can expend resources to "design around a patent." It is almost always in the consumer interest for firms to design around rather than face litigation.

   d) How innovator companies may have strategic reasons for delisting a patent from the Orange Book to the detriment of generic entry and consumer interests. Delisting does not immunize a generic entrant from future patent litigation but could deny it the "rewards" from a successful defense.

THE INCENTIVES FOR GENERIC ENTRY

5. This 180-day exclusivity provision is a key component of the Hatch-Waxman framework, encouraging generic companies to challenge innovator company patents as soon as possible and, where such challenges are successful, providing consumers quicker access to lower-priced generic versions of brand drug products. I first discuss the general incentives for generic entry in order to explain how 180-day exclusivity fits into the framework.

6.  Generic drug companies enter specific drug markets because they expect to earn profits from doing so, that is, they expect future revenues from that market to exceed costs. A useful way of looking at this decision is to distinguish future net revenue from entry costs. By future net revenue, I mean revenues minus production costs at each future date. Since future revenues and costs will occur well into the future, they can be highly uncertain at the time a firm makes its entry decision. Entry costs are the costs associated with preparing an ANDA, setting up a production line and defending against legal challenges. These costs are largely borne prior to the production and sale of the first unit and, thus, are incurred before any future net revenues are realized. The entry decision hinges on whether expected future net revenue will exceed the entry costs.

7.  The components of future net revenues are revenues minus production costs. It is useful to think of revenues as price times the quantity sold and production costs as an average unit cost times the quantity sold, or, by (price minus average cost) multiplied by quantity sold. During periods when price exceeds average cost, net future revenues are growing, and economists say that generic drug firms are earning rents. The size of these rents will be proportional to both this price-cost margin and the quantity sold. Therefore, factors that tend to increase either price-cost margin or the quantity sold will increase the total rents available to generic producers.

8.  Generic drug producers usually anticipate that prices initially will be higher than average cost but will then fall as more generic competitors enter and drive down prices. Entry reduces the size of rents flowing to any individual firm in two ways. First, with more competitors, each one will capture a smaller share of the total available rents. Second, with more competition, we typically observe prices driven down toward the cost of production, which

reduces total available rents. For both reasons, additional entry typically reduces the rents to any individual entrant. Because these rents fall with successive entry, each generic company will attempt to enter as early as possible in order to capture the greatest possible rents.

9. The entry costs for generic producers are typically those associated with preparing an ANDA filing, setting up a production line, and defending against possible legal challenges. These factors can be affected by features of the particular chemical or firm; for example, the complexity of the manufacturing process and the firm's prior experience. While initial ANDA applications are often found deficient, resubmissions usually occur until the ANDA is approvable. This process makes predicting the timing of entry particularly difficult for a generic firm. In this way, generic entry usually can be likened to a "lottery" in which firms purchase a "ticket" by sinking entry costs in the hopes of obtaining the "winning lottery ticket" of early approval. Of course, they know that other firms may be vying for early approval and hence make entry decisions based on their expectations of earlier or later entry.

10. Because of competitive effects, each firm that does enter will tend to decrease the expected net future revenues available to all other firms. Therefore, the profitability of entry will be declining in relation to the number of producers who decide to enter with generic products. After some number of entrants, subsequent entry would be expected to lead to losses, not profits. In this way, we expect the number of generic producers to adjust so that expected net future revenues per firm are close to the entry costs. Brand-name drugs that represent larger potential generic profits usually experience more entry while those whose entry costs are disproportionately larger tend to have fewer entrants. All else equal, factors that increase expected net revenues will increase profitability and hence will increase entry while factors that increase entry costs decrease profitability and hence decrease entry.

11. Uncertainty about intellectual property protections can indicate potential additional costs of obtaining entry. The possibility of patent infringement litigation can imply much higher entry costs for generic firms. Innovator drugs typically are protected by a single patent covering the chemical itself and generic drug entry may not occur until this patent expires. Some innovator firms obtain additional patents, especially for their more profitable drug products, that may or may not prevent generic entry. Determining whether a generic product does, or does not, infringe on these patents may involve substantial research and litigation costs. The prospect of incurring these costs may lead a generic firm to avoid seeking an ANDA from the FDA even when the rents to generic entry would be large.

12. The policy of granting a 180 day exclusivity period to the first generic firm to enter encourages entry, particularly for those cases when additional patents protect an innovator's product. Innovator firms list with the FDA the relevant patents, including those beyond the primary one, which pertain to their drug products. The first non-infringing generic entrant for these products would enjoy exclusivity from generic competition during this time period. Since this exclusivity could be worth millions of dollars to a generic firm, it provides an incentive to enter even if a patent challenge were possible.

CONDITIONING 180-DAY EXCLUSIVITY ON LITIGATION

13. A generic firm may or may not face patent litigation in these cases. At the time it must sink the resources into an ANDA submission, it only knows that multiple patents exist and, therefore, that patent litigation is possible. Given this possibility, a generic firm has an incentive to attempt to minimize patent litigation costs or avoid them altogether. It may be able to do this

6

by sinking resources into "designing around a patent." These expenditures would tend to reduce the costs of obtaining entry by reducing the likelihood of a patent holder bringing a suit, by reducing the likelihood of patent holder success if a suit is brought, and/or reducing the costs of defending against a suit. Efficient policy regarding assigning the 180-day exclusivity will depend on the extent to which generic firms can sink these resources into "designing around a patent."

14. A policy in which the 180-day exclusivity is granted only when patent litigation ensues could be warranted if certain conditions prevail. A 180-day exclusivity period would generate rents that could be quite valuable to a generic entrant, especially when sales for the chemical are large. The promise of these rents could help "ensure" the ANDA applicant against the "damages" emanating from a costly legal suit. However, if the suit does not occur, the insurance need not be paid. In this way, the return to the generic entry would be what a typical firm would expect to earn if there was no risk of "damages" from a patent infringement suit.

15. The above situation assumes that the risk of "damages" from a lawsuit is completely random for generic firms. It assumes that generic companies can take no measures to avoid litigation. However, generic firms may be able to expend resources so as to avoid costly litigation by attempting to "design around a patent." Expending these resources may decrease the likelihood of a patent holder bringing a suit, decrease the likelihood of a patent holder success if a suit is brought, or decrease the costs of defending against a suit. In these ways, expending these resources increases the likelihood of generic entry and decreases the expected time before generic entry.

16. Efficient policy regarding 180-day exclusivity should not distinguish between two different legitimate mechanisms that bring about a socially efficient goal. One legitimate

7

mechanism would be to successfully defend against infringement if a suit arises while the other

avoids the costs that the suit implies. Before it seeks Paragraph IV certification, a generic firm

develops a strategy that will minimize its cost of entry while maximizing its likelihood of

success. When possible, this strategy is likely to include both a legal strategy and a

technological strategy so as to avoid the necessity of the legal option. Consumers are better off if

either strategy succeeds. However, if only the legal strategy is rewarded with 180-day

exclusivity, generic firms will under-invest in the technological strategy and may face patent

litigation that could have been easily avoided. As a consequence, more Paragraph IV ANDAs

will be challenged, fewer will succeed, and litigation costs may increase. The result for

consumers will be a decreased likelihood of generic entry and higher expected drug costs.


REMOVING 180-DAY EXCLUSIVITY DUE TO "DELISTING"


17. Generic firms decide whether or not to sink resources into "designing around a

patent" based on the patents that are listed at the time of their decision. At that time, they make a

determination of the costs and likelihood of developing a drug that will not infringe on the

innovator's patents and of the expected net revenues, including additional rents that would

accrue due to 180-day exclusivity. Preparation for an ANDA submission may begin years prior

to the actual submission. By the time a patent is "delisted" at the FDA, much of the preparation

costs are likely to have been sunk. If generic firms believed that the 180-day exclusivity period

would be removed due to patent "delisting," they would be less likely to sink the resources into

"designing around a patent" and preparing for a legal challenge. As a consequence, consumers

could expect a decreased likelihood of generic entry and higher expected drug costs.

8

STRATEGIC REASONS TO "DELIST"

18. While more and earlier generic entry usually increases consumer welfare it also reduces patent holder profits. Because of this, patent holders will often have incentives that are at odds with the consumer interest. Innovator drug companies have developed a number of strategies to limit or delay entry by generic drug firms. For example, it might bring a patent infringement suit even if the likelihood of success was low.[4] Other examples are documented in the FTC Generic Drug Study[5] and have led to new regulations that have reduced the set of strategies available to the innovator firms.

19. Innovators have incentives to pursue any remaining strategies that reduce entry by limiting the rents that potential generic entrants can expect. For example, anticipation that the innovator will preemptively introduce a generic version of its drug along with its branded version, a so-called 'authorized generic,' will eliminate much of the rents to independent generic entrants. With the "winning lottery ticket" removed as a possibility, the number of competing generic firms is reduced, which in turn tends to raise the long-run generic price and lessen switching from brand-name drugs to their generic equivalents.

20. Any similar action on the part of the innovator to reduce expected generic rents will also tend to limit generic entry, raise generic prices, and lessen switching from brand-name drugs to their generic equivalents. In particular, an innovator would be able to limit generic rents by

_____

4. A patent holder defending a legitimate patent from infringing competitive entry is in the consumer interest. The ability to limit infringement provides an incentive for firms to produce the products that consumers enjoy. However, an innovator firm would have an incentive to block competitive entry irrespective of the legitimacy of its means.
5. "Generic Drug Entry Prior to Patent Expiration: A Study," FTC, July, 2002, <http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf>

delisting a patent. I understand that FDA's position is that it will not examine the propriety of any decision by NDA holders to list or delist a patent. I also understand that failure to list a particular patent does not limit a patent holder's ability to bring a patent infringement suit against a generic firm.

21. In this case, an NDA holder may wish to list a patent with the hope that the patent will deter entry. Once it is aware of a Paragraph IV ANDA certification, it may choose to bring a suit or to delist. The patent holder will likely bring a patent infringement suit when it expects a high enough likelihood that it will prevail. When, instead, it expects that the likelihood of success is low, it would be able to delist the patent so as to deny the 180-day exclusivity to the first ANDA filer. This case would occur more often when the ANDA filer has expended the resources to "design around the patent." Precisely because the ANDA filer has avoided patent litigation, the patent holder can deny the ANDA holder the 180-day exclusivity. In this way, an innovator can take actions that lead to fewer generic firms choosing to enter and the long-run generic price becoming higher so as to increase its profits from fewer consumers switching from the brand-name dug to a generic product.

CONCLUSION

22. Generic drug entry that does not infringe on innovator patents is in the consumer interest. Such entry enhances competition and provides consumers with lower prices earlier. Such entry may be deterred when the litigation costs are larger than the rents a generic firm could expect. The 180-day exclusivity provides for additional rents that have encouraged generic drug companies to enter even when they face the prospect of costly litigation. Further, it

has led generic firms to invest in technological strategies that reduce the likelihood of

infringement and the expected litigation costs. Because this strategy entails sinking resources

early and because patent holders can strategically use delisting to deter entry, efficient policy

would not remove 180-day exclusivity when patents are delisted.


I declare under penalty of perjury that the foregoing is true and correct. Executed on December,

12, 2005.

Exhibit A

Michael R. Ward

**CURRICULUM VITAE**
**November 2005**

## CURRENT POSITION

Associate Professor, Dept. of Economics, University of Texas at Arlington, 2003-.

## CONTACT INFORMATION

Michael R. Ward
Associate Professor
Department of Economics
University of Texas at Arlington
Arlington, TX 76019
817-272-3090
mikeward@uta.edu
<http://www.uta.edu/faculty/mikeward/>

## EDUCATION

B.A. (Mathematics and Economics), University of California, Los Angeles, 1983
M.A. (Economics), University of Chicago, 1986
Ph.D. (Economics), University of Chicago, 1993
Dissertation: "The Determinants of Innovative Effort: Evidence from the Pharmaceutical Industry"

## FIELDS OF SPECIALIZATION

Applied Price Theory, Industrial Organization, Economics of Innovation

## PREVIOUS POSITIONS

Visiting Associate Professor, Dept. of Economics, University of Texas at Arlington, 2002-2003.
Associate Professor, Dept. of Agricultural and Consumer Economics, University of Illinois, 2001-2003.
Assistant Professor, Dept. of Agricultural and Consumer Economics, University of Illinois, 1995-2001.
Economist, Federal Trade Commission, 1991-1995.
Adjunct Lecturer, George Washington University, Spring, 1993.
Senior Economist, Criterion, Inc., 1983-1985.

1

## OTHER AFFILIATIONS

Affiliate, Institute for Government and Public Affairs, University of Illinois 1999-2002
Affiliate, Consortium for Research on Telecommunications Policy, 1999-
Special Consultant, Federal Trade Commission, 1995-2001

## AWARDS

Alumni Scholar, UCLA, 1980
Graduated Magma Cum Laude, UCLA, 1983
Passed University of Chicago Economics Core Examination with Distinction, 1986
Outstanding Club Advisor, Consumer Economics Club, University of Illinois, 1997
Nominated for Outstanding Graduate Faculty Award, ACE Dept., 2001
Earl M. and Mildred S. Hughes Teaching Enhancement Award in ACE, University of Illinois, 2001
UTA College of Business Administration Research Grant Award, 2005

## GRANTS RECEIVED

"The ACELink Project; Phase 1;" Granting Agency: Vice President for Academic Affairs, UI; UI matching grants; Dates: 1/1/96 - 12/1/97, Amount: $25,000, PI: Gerald Nelson; Co-PI's: John Braden, Sara Douglas, Paul Ellinger, Vicki Fitzsimmons, Roberto Garcia, Hilda Lakner, Mike Mazzocco, Dave Lins, Bruce Sherrick, Wes Seitz, Laurian Unnevehr, Michael R. Ward

"The ACELink Project; Phase 2;" Granting Agency: Vice President for Academic Affairs, UI; UI matching grants; Dates: 1/1/97 - 5/21/98, Amount: $93,960, PI: Gerald Nelson; Co-PI's: John Braden, Sara Douglas, Paul Ellinger, Vicki Fitzsimmons, Roberto Garcia, Hilda Lakner, Mike Mazzocco, Dave Lins, Bruce Sherrick, Wes Seitz, Laurian Unnevehr, Michael R. Ward

"The ACELink Project; Phase 2, additional support;" Granting Agency: Vice President for Academic Affairs, UI; UI matching grants; Dates: 2/1/98 - 6/1/98, Amount: $7,700, PI: Gerald Nelson; Co-PI's: John Braden, Sara Douglas, Paul Ellinger, Vicki Fitzsimmons, Roberto Garcia, Hilda Lakner, Mike Mazzocco, Dave Lins, Bruce Sherrick, Wes Seitz, Laurian Unnevehr, Michael R. Ward

"Evaluating the Social Benefits and Market Potential for Health Characteristics of Soy-based Products;" Granting Agency: Illinois Council on Food and Agriculture Research Value-Added SRI; Dates: 6/96-9/97; Amount: $33,000, PI: Laurian Unnevehr; Co-PI's: Clare Hasler, Barbara Klein, Anne Villamil, Michael R. Ward

"Consumer Search and Product Differentiation in Long Distance Telecommunications;" Granting Agency: UIUC Research Board; Dates: 6/97-6/98; Amount: $19,500, PI: Michael R. Ward.

"Food on the Net;" Granting Agency: Illinois Council on Food and Agriculture Research; Dates: 6/98-6/00; Amount: $45,000 PI: Michael R. Ward.

"Wireline and Wireless Substitutability;" Granting Agency: Consortium for Research on Telecommunications Policy Research and Strategy; Dates: 5/99-8/99; Amount: $13,500, PI: Michael R. Ward.

Summer Research Grant, Granting Agency: UTA College of Business Administration; Dates: 6/05-

2

8/05; Amount: $6,500, PI: Michael R. Ward.
"Rationalizing the E-rate," Granting Agency: NET Institute; Dates: 7/05-9/05; Amount: $4,500, PI: Michael R. Ward.

## TEACHING EXPERIENCE

Consumer Economics
Economics and Regulation of Information
Internet Economics
Economics for Managers
Labor Economics
Graduate Price Theory
Graduate Economics of Consumer Behavior
Graduate Discrete Choice Econometrics
Graduate Labor Economics
Graduate Human Resource Economics
Graduate Industrial Organization
MBA Managerial Economics
Executive MBA Managerial Economics

## THESES SUPERVISED

Eight Doctoral Committees at UIUC (Chair or Director of Research on Four)
Four Masters Committees at UIUC (Chair on Three)
Two Masters Committees at UTA (Chair on Both)
Two Honors Theses at UTA

## PROFESSIONAL SERVICE

Referee for *Economic Inquiry, International Journal of the Economics of Business, International Regional Science Review, Journal of Business Research, Journal of Econometrics, Journal of Economic Behavior and Organization, Review of Economics and Finance, Review of Economics and Statistics, Journal of Law and Economics, Journal of Political Economy, Journal of Product and Brand Management, Journal of Regulatory Economics, Review of Agricultural Economics, Southern Economic Journal, Telecommunications Policy.*
Discussant at AEA, WEA, SEA and numerous other conferences.
Grant Reviewer for the Illinois Council on Food and Agriculture Research, 1997.
Grant Reviewer for the National Science Foundation, 2003.
Reviewer for American Agricultural Economics Association (AAEA) Consumer Economics Session, 1998.
Reviewer for American Agricultural Economics Association (AAEA) Industrial Organization Session, 2002.
Reviewer for University of Illinois Urbana-Champaign (UIUC) Research Board, 2002

Reviewer for International Conference on Information Systems (ICIS) 2003.
Seminar Coordinator, FTC, 1991-1995.
Seminar Coordinator, UTA, 2002-.

## BIBLIOGRAPHY

### *Articles*

David Reiffen and Michael R. Ward, "'Branded Generics' as a Strategy to Limit Cannibalization of Pharmaceutical Markets," *Managerial and Decision Economics*, forthcoming.

David Reiffen and Michael R. Ward, "Generic Drug Industry Dynamics," *Review of Economics and Statistics*, 87(1) (Feb. 2005) 37-49 .

Mark J. Rodini, Glenn A. Worroch, and Michael R. Ward, "Going Mobile: Substitutability Between Fixed and Mobile Access," *Telecommunications Policy* 27 (2003) 457-476.

David Reiffen and Michael R. Ward, "Recent Empirical Evidence on Discrimination by Regulated Firms," *Review of Network Economics* v1 n1 (Mar., 2002).

Michael R. Ward, "Will E-commerce Compete more with Traditional Retail or Direct Marketing?," *Netnomics* v3 n2 (Sept., 2001) 103-117.

Michael R. Ward, "Emerging Competition Policy Issues for Agricultural Biotechnology," *American Behavioral Scientist* v44 n3 (Nov., 2000).

David Reiffen, Laurence Schumann and Michael R. Ward, "Discriminatory Dealing with Downstream Competitors: Evidence from the Cellular Industry," *Journal of Industrial Economics* v48 n3 (Sept., 2000).

Michael R. Ward and Michael J. Lee, "Internet Shopping, Consumer Search, and Product Branding," *Journal of Product and Brand Management* v9 n1 (April, 2000).

Michael R. Ward, "Product Substitutability and Competition in Long Distance Telecommunications," *Economic Inquiry* v37 n4 (October, 1999).

Laurian Unnevehr, Michael R. Ward and Clare Hasler, "Regulating Health Claims on Food Products: The Balance between Consumer Choice and Consumer Protection," *Choices*, (First Quarter, 1998).

Michael R. Ward, "The Effect of the Internet on Political Institutions," *Industry and Corporate Change* v5 n4 (1996) 1127-1141.

Steve G. Parsons and Michael R. Ward, "The Influence of Regulation on Marginal Factor Cost: Access Markets in US Telecommunications," *Information Economics and Policy*, v8 (June, 1996) 95-106.

Steve G. Parsons and Michael R. Ward "Factor Substitution in Long Distance Telephony," *Southern Economic Journal* (October, 1995).

Michael R. Ward and David Dranove, "The Vertical Chain of Research and Development in the Pharmaceutical Industry," *Economic Inquiry*, v33 n1 (January, 1995).

Michael R. Ward, "The Economics of FDA Drug Approvals," *Journal of Medical Practice Management* (Winter 1993).

Michael R. Ward, "Drug Approval Over-Regulation," *Regulation* (Fall 1992).

### *Published Reports*

4

Michael R. Ward, "Measurements of Market Power in Long Distance Telecommunications," Bureau of Economics Staff Report, Federal Trade Commission, April 1995.

**Book Chapters**

David Reiffen and Michael R. Ward, "Generic Drug Competition: USA experience and lessons for Europe," (forthcoming).

Michael R. Ward and Michelle Morganosky, "Online Consumer Search and Purchase in a Multiple Channel Environment," in *Advances in Microeconomics Volume 11: Internet Economics*, Michael R. Baye editor (JAI Press: Greenwich, CN, forthcoming 2003).

Michael R. Ward, "The Economics of Online Retail Markets," in *The International Handbook on Emerging Telecommunications Networks*, Gary Madden & Scott Savage editors (Edward Elgar Publishers, forthcoming, 2002).

Michael R. Ward, "On Forecasting the Demand for E-commerce," in *Forecasting the Internet: Understanding the Explosive Growth of Data Communications*, David G. Loomis & Lester D. Taylor editors. (Kluwer Academic Publishers, 2001).

**Book Reviews**

Michael R. Ward, Review of "Vertical Integration in Cable Television," by David Waterman and Andrew A. Weiss. Cambridge, MA and Washington, DC: MIT Press and AEI Press, 1997, 185 pages for the *Review of Industrial Organization* (1998) 609-612.

**Other Professional Contribution**

Michael R. Ward, "Ancient Babylonian Stock Markets," *Journal of Political Economy*, 113(2) (April 2005), Back Cover.

**Working Papers**

Michael R. Ward, "Rationalizing the E-Rate: The Effects of Subsidizing IT in Education," Nov. 2005 <http://www.uta.edu/faculty/mikeward/ERate_MRW.pdf>.

Nicholas K. Oxedine and Michael R. Ward, "Price Effects from Retail Gasoline Mergers," April, 2005 <http://www.uta.edu/faculty/mikeward/gasmergers.pdf>.

Michael R. Ward and Gleen Woroch, Fixed-Mobile Telephone Subscription Substitution in the U.S." May, 2005 <http://www.uta.edu/faculty/mikeward/MFS3.pdf>.

Michael R. Ward and Gleen Woroch, "Usage Substitution between Mobile Telephone and Fixed line in the U.S." May, 2004 <http://www.uta.edu/faculty/mikeward/mobile%20usage.pdf>.

Michael R. Ward and Yu-Ching Chen, "Price Increases from Online Privacy," presented at the 29th Annual Telecommunications Policy Research Conference, October, 2001.

David Reiffen and Michael R. Ward, "The Effect of 'Branded Generics' on Pharmaceutical Markets," under review as a Bureau of Economics Staff Report, Federal Trade Commission.

A. M. Isserman, A. W. Ando, R. J. Hauser, P. E. McNamara, B. E. Swanson, and M. R. Ward. "Professors' Rural Policy Ideas for Legislatures Interested in Rural Initiatives," presented at the University of Wisconsin, Madison, March, 2001 and the Southern Regional Science Association, Austin, April, 2001.

Michael R. Ward, "Are Internet Grocery Markets More Efficient?," presented at *The American Consumer and the Changing Structure of the Food System*, May, 2000 and Western

Economic Association meetings, July, 2001.

Michael R. Ward and Glenn A. Woroch, "Do Wireless and Wireline Service Compete?," presented at the International Communications Forecasting Conference, June 1999 and Rutgers Western Conference on Regulation and Public Utility Economics, July, 2000.

Michael R. Ward and Carlos Arango, "Consumer Search and Price Discrimination," presented at the Consortium for Research on Telecommunications Policy and Strategy, June, 1998, Rutgers Western Conference on Regulation and Public Utility Economics, July, 1998, and Federal Trade Commission, May, 2000.

David Reiffen, Laurence Schumann and Michael R. Ward, "Discriminatory Dealing with Downstream Competitors: Evidence from the Cellular Industry," FTC Bureau of Economics Working Paper 215.

Michael R. Ward, "Prices, Productivity and Industry Structure: Evidence from the Long Distance Industry," presented at the 23rd Annual Telecommunications Policy Research Conference, September, 1995 and the Rutgers Western Conference on Regulation and Public Utility Economics, July, 1996.

Timothy P. Daniel, Richard T. Shin and Michael R. Ward, "What's a Regulator to Do?  Response to Competition in Local Telephone Service," presented at the 21st Annual Telecommunication Policy Research Conference, September, 1993.

Steve G. Parsons and Michael R. Ward, "Telecommunications Bypass and the 'Brandon Effect,'" FTC Bureau of Economics Working Paper 199, 1993.

## COMMENTS BEFORE REGULATORY BODIES

Testimony on behalf of the Central Waste Services in regards the proposed transfer station facility in Urbana, Illinois before the Urbana City Council, 2000-2001.

Testimony on the proposed merger between Superior Propane and ICG Propane before the Canadian Competition Tribunal, 1999-2000.

Reply Comment of the Staff of the Bureau of Economics of the Federal Trade Commission before the Federal Communications Commission in the matter of American Telephone and Telegraph Company Reclassification of AT&T as a Nondominant Carrier (CC Docket No. 79-252), June 30, 1995.

Reply Comment of the Staff of the Bureau of Economics of the Federal Trade Commission before the Federal Communications Commission in the matter of Revisions tp Price Cap Rules for AT&T (CC Docket No. 93-197), October 25, 1993.

Comment of the Staff of the Bureau of Economics of the Federal Trade Commission before the Federal Communications Commission in the matter of Expanded Interconnection with Local Telephone Company Facilities (CC Docket No. 91-141), March 5, 1993 (with Richard Shin).

## CONSULTING EXPERIENCE

Federal Trade Commission
Canadian Competition Bureau
Central Waste Services

Eli Lilly & Co.
Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield
      of Massachusetts, Inc, & Excellus Health Plan, Inc
Chesky Mobile
MCI-Verizon
Ranbaxy Pharmaceuticals

## CURRENT RESEARCH

Internalizing R&D Spillovers in Mergers - Empirically examines recent pharmaceutical mergers
for evidence that they internalized R&D spillovers. Analysis of firms' research portfolios allow for
a test that distinguishes between mergers for monopoly and those intended to generate efficiencies.

Wireline and Wireless Substitutability (with Glenn Woroch) - Empirically examines the
substitutability of wireless telephone service for wireline telephone service. Attempts to determine
if substitutability has increased from 1999 to the present and the potential scope for wireless service
providing competitive pressure on wireline service.

A Model of Target Marketing - Develop a model of firms' costly information transmission to
consumer types more likely to purchase.

The Effect of Public Funding of a Sports Stadium on Housing Values (with Craig Depken) - Analyze
the effects of announcement of the new Dallas Cowboys's stadium selection site on home prices.
Attempt to disentangle "amenity" effect from "tax burden" effect.

## INVITED PRESENTATIONS

Pharmaceutical Economics Policy Council, 2006
New York University, 2006
Stanford University, 2004
London Business School, 2004
American Economics Association, 2003, 2006
ZEW Conference on the Economics of Information and Communication Technologies, 2002, 2004,
      2005
University of Texas at Arlington, 2002, 2003, 2004, 2005
University of North Texas, 2002
Cal State University at Long Beach, 2002
Western Economics Association Meetings, 2001
Berlin Internet Economics Conference, 1999, 2000
USDA, 2000
International Communications Forecasting Conference, 1999
University of Chicago, 1998
University of Missouri, 1998

Canadian Competition Bureau, 1998
Consortium for Telecommunications Policy Research Conference, 1996, 1998
University of Teeside, 1996
University of Illinois at Urbana-Champaign, 1995, 2002
Cornell University, 1995
Loyola University of Chicago, 1995.
Illinois Commerce Commission, 1995
Federal Communications Commission, 1995, 2000
Telecommunications Policy Research Conference, 1993, 1995, 1996, 1999, 2002, 2004
Rutgers Advanced Workshop in Public Utilities Economics and Regulation, 1993, 1996, 1997, 1998, 2000, 2002, 2005
UCLA, 1992
Cato Institute, 1992
Department of Justice, Antitrust Division, 1992
Southern Economics Association Meetings, 1991, 1996
US Census Bureau, 1991
Federal Trade Commission, 1991, 2000
University of Houston, 1991
University of Michigan, 1991