UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RANBAXY LABORATORIES LIMITED, et. al., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL O. LEAVITT, et. al., <br><br> Defendants. | ) ) ) ) ) ) ) ) CIVIL NO. 05-CV-1838 (RWR) ) ) ) ) ) ) |
| IVAX PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL O. LEAVITT, et. al., <br><br> Defendants. | ) ) ) ) ) ) ) ) CIVIL NO. 05-CV-2180 (RWR) ) ) ) ) ) ) ) |

NOTICE OF SUPPLEMENTAL AUTHORITY

Ranbaxy Laboratories Limited, Ranbaxy, Inc. and Ranbaxy Pharmaceuticals, Inc. (collectively "Ranbaxy") and IVAX Pharmaceuticals, Inc. ("IVAX") submit this notice to bring to the Court's attention additional authority that has come to the plaintiffs' attention since the close of briefing on Dec. 30, 2006 and which is relevant to resolution of this case.

1.  FDA has argued that its decision in this matter permits all ANDAs to get to market faster when a patent is withdrawn from The Orange Book (by denying 180-day exclusivity to the first applicant to have filed an abbreviated drug application containing a paragraph IV certification) and therefore is "more consistent" with the purpose of the statute -- to get

generics into the hands of patients at reasonable prices-fast. FDA Reply at 12; FDA Opp. at 34-36. In fact, the administrative decision being reviewed by the Court is based on this rationale, and explicitly states that depriving the first applicants to file ANDAs containing paragraph IV certifications of exclusivity maintains the "appropriate balance between competition and incentive." FDA Decision, A.R. Tab 23 at 13. In another case before this Court, involving pravastatin, decided just last week, FDA took a different, and inconsistent, view of how the purpose of the statute is best served. In the pravastatin case FDA was called upon to determine how it would interpret the court decision trigger requirement of 180-day exclusivity. The agency had been urged by one of the parties to adopt an interpretation that makes it easier to trigger 180-day exclusivity because it would speed approval of all ANDA applicants. FDA, however, refused to reduce the value of 180-day exclusivity and rejected the proposition that the purposes of Hatch Waxman could be served by allowing all ANDA applicants to get to market faster. Instead, it concluded that reducing the certainty that a first filer will obtain exclusivity could "diminish incentives for ANDA applicants to challenge an innovator's patents."

> . . . Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for the 180-day exclusivity under section 505(j)(5)(B)(iv).
>
> A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow

> interpretation, such as the "holding-on-the-merits" standard, may
> slow approval of subsequent ANDAs and competition in a specific
> case. It could, however, make exclusivity more valuable, and thus
> make patent challenges more common overall.

Letter from Gary Buehler, Director, Office of Generic Drugs to Apotex Corp., Apr.11, 2006 (attached hereto) at 12-13. FDA's position in the pravastatin case is exactly what Ranbaxy and Teva have urged in this case. In this case, however, FDA argues that delisting patents and terminating exclusivity "would not appear to undermine the effectiveness of exclusivity as an incentive to challenge patents." FDA Decision, Tab 23 at 16. This authority is material because it demonstrates how the interpretation of the statute the agency relies on in this case is contrary to the intent of Congress and is inconsistent with the agency's analysis and other pronouncements on the same issue.

2. There is a second inconsistency between FDA's positions in the pravastatin case and the instant case. In pravastatin, like here, the first ANDA filer was not sued by the patent holder in response to its paragraph IV certification. Yet, FDA concluded that the first filer in pravastatin was entitled to exclusivity because "[t]he statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself *to the risk of being sued* for infringing a patent that is the subject of a paragraph IV certification." 4/11/06 Buehler Letter to Apotex at 3 (emphasis added). IVAX and Ranbaxy exposed themselves to precisely that same risk of litigation when they filed their paragraph IV certifications before any other ANDA applicant, yet FDA has denied IVAX and Ranbaxy the very reward the Agency said, just two weeks ago, is provided under the exclusivity statute.

3. FDA has argued that it is entitled to substantial deference in this case because the Court is evaluating an agency's interpretation of its own regulations. FDA Opp. at 19. Since the

3

briefs were filed, the Supreme Court, in Gonzalez v. Oregon, 126 S.Ct. 904 (2006), has affirmed that an agency is not entitled to deference for an interpretation of its regulations when the current interpretation runs counter to the intent at the time the regulation was promulgated. 126 S.Ct. at 916 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)) ("That the current interpretation runs counter to the 'intent at the time of regulations promulgation, "is an additional reason why Auer deference is unwarranted.") This authority is material to this case because the interpretation of 21 C.F.R. § 314.94(a)(12)(viii)(B) FDA relies on in this case runs counter to the intent of the regulation at the time it was promulgated. See, e.g., Ranbaxy's Mem P.&A. in Support of Plaintiff's Motion for Summ. J. at 35-36; IVAX Pharmaceutical Inc.'s Mem. in Support of its Motion for Summ. J. at 22-23.

Dated: April 25, 2006

Respectfully submitted,

_/s/ Jay B. Shapiro/cas_
Jay B. Shapiro
Samuel O. Patmore
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Suite 2200
Miami, FL 33130
(305) 789-3200
(305) 789-3395

Robert A. Dormer
John R. Fleder
Douglas B. Farquhar
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth St. N.W.
Washington, D.C. 20005
202-737-4282
202-737-9329(facsimile)
*Counsel for Ivax*

_/s/ Kate C. Beardsley_
Kate C. Beardsley
D.C. Bar No. 416806
Carmen M. Shepard
D.C. Bar No. 331314

BUC & BEARDSLEY
919 Eighteenth Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 736-3600

*Counsel for Ranbaxy*

4



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                                Public Health Service

---

ANDA 76-341                                                              Food and Drug Administration
                                                                         Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

    This letter is prompted by the March 16, 2006, opinion of the District of Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*"). We are amending our response to the letter submitted by Apotex Inc. on September 7, 2004. Apotex sought a determination that a dismissal of a declaratory judgment action brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v. Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a "court decision trigger" beginning the 180-day period of marketing exclusivity for the first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV" certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg., and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005, that the dismissal constituted a court decision trigger, based on an interpretation of the court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit: *Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court decision trigger if the patentee is estopped from enforcing its patent against the declaratory plaintiff.

    Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On appeal, the *Teva III* court vacated the judgment of the district court with instructions to vacate the FDA's decision and remand to the agency for further proceedings. The court held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been decided purely on procedural grounds and "left the final decision" of statutory interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.  Statutory and Procedural Background

   A.  180-Day Exclusivity and the Court Decision Trigger

Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after -
>
> (I)    the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)   the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." See, e.g., Purepac Pharm. Co. v. Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. See The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

3

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

 B. The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

### C. FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

5

D.   *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.   FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

6

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

    A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

        1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I*'s discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

7

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

8

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

        2.      FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

9

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. See 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

### 3. FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

10

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra*. FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec*." *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.   FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

12

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

> The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

13

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.   Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

>    held a hearing, and the like . . . bear no relationship either to whether the decision "hold[s] the patent . . . to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

14

III.   Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability. The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding. FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15